(152 App. Div. 918.)

BIGGS v. SEA GATE ASS'N.

(Supreme Court, Appellate Division, Second Department. October 11, 1912.)

1. MUNICIPAL CORPORATIONS (§ 710*)—CITY ADDITION—PRIVATE SEWER AND WATER SYSTEM—EXTENSION.

　　Where plaintiff, at the time she purchased certain property platted and sold by defendant's predecessor, knew that no water or sewer pipes had ever been laid through the street on which her property abutted, and the advertisements issued to attract customers to the property, though reciting that the vendor company had completed a system of macadamized roads and sewer, water, and gas mains extended beneath, did not represent that the system had been completed through the street on which the property of plaintiff abutted, and there was no promise that it would ever be constructed there, the defendant association was under no obligation to extend the water and sewer system then in existence, so as to afford plaintiff such service.

　　[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1520; Dec. Dig. § 710.*]

2. MUNICIPAL CORPORATIONS (§ 710*)—PRIVATE SEWERS—RIGHT TO USE.

　　Where an association of dwellers in certain outlying platted property owned the streets, sewerage, and water systems, etc., the right to use

such systems by dwellers on property within the plat was subject to the reasonable regulation of the association for the benefit of other members thereof; and hence plaintiff was not entitled to use the water and sewer system for the conduct of a boarding house, in violation of a prior regulation, of which she had knowledge at the time she purchased, that the system should not be further burdened by subjecting it to the use of buildings erected for boarding houses, lodging houses, and inn and hotel purposes.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1520; Dec. Dig. § 710.*]

3. MUNICIPAL CORPORATIONS (§ 710*)—PRIVATE SEWERS—USE—REGULATIONS —FRAUD.

Plaintiff, before purchasing certain property in the plat, knew of the regulation as to such sewers, and, to induce defendant to extend its sewer and water systems to such property, represented that it was to be used as a private residence. Thereafter, however, she proceeded to use the same for a boarding house. *Held,* that plaintiff's false representations entitled defendant to withdraw from its agreement to afford plaintiff sewer and water connections, and to sever plaintiff's property from such connections.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1520; Dec. Dig. § 710.*]

Woodward and Rich, JJ., dissenting.

Appeal from Special Term, Kings County.

Suit by Helen W. Biggs against the Sea Gate Association. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Argued before JENKS, P. J., and BURR, THOMAS, WOODWARD, and RICH, JJ.

Charles J. McDermott, of Brooklyn, for appellant.
Walter W. Irwin, of New York City, for respondent.

PER CURIAM. [1] The learned court at Special Term has found, and the evidence sustains the finding, that when plaintiff purchased the premises in question, abutting on Beach Fiftieth street at Sea Gate, no water or sewer pipes had ever been laid through said street, and that plaintiff knew such was the fact. Was the defendant under a legal obligation, which plaintiff could enforce, to install a system of sewers and water supply for the benefit of plaintiff's land? The court at Special Term has also found as a conclusion of law that plaintiff, as the successor in title of James McAlley, when she purchased the property in question, acquired the right to use the sewer and water systems belonging to defendant, existing at Sea Gate. Without determining this question, if we concede this to be so, this would not necessarily include the right to compel defendant to extend such system. By her deed plaintiff acquired no interest in the fee of the strip of land laid down on the map as Beach Fiftieth street, but this belonged to defendant. While she may have acquired an easement of access over the same, she could not acquire an easement therein for water supply or sewer system, for no such system was in existence. If she had a right to make use of such sewers and pipes for water supply as were then in existence elsewhere, she could not compel defendant to furnish her facilities for connecting with the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

same over other land belonging to it. If plaintiff can avail herself of the representations contained in the maps and prospectus issued by the Norton Point Land Company, these related only to an existing state of affairs, and not to something still to be done. The advertisements, prospectus, and pamphlets issued to attract customers by the Norton Point Land Company contained statements such as the. following:

"The company has *completed* a system of macadamized roads and sewer, water, and gas mains extended beneath."

"The improvements that *have been made* upon the property by the Norton Point Land Company comprise some 25,000 feet of macadamized street, curbs, sidewalks, water, gas, and an underground electric lighting service, together with a perfect system of sanitary sewerage for which improvements there will be no assessments; Sea Gate being a fully finished property."

"The sewerage system which *has been* introduced, together with the water and gas mains and the electric light service, have all been built in the most substantial manner under the supervision of the company at a cost of over $300,000, which is in itself a guarantee of its permanency."

And again:

"All sales made subject to the approval of the company. All improvements introduced, sewers, macadamized roads, water, gas, and electricity, with no assessments to purchasers."

There was not only no representation that the "system" had been completed through Beach Fiftieth street, but there was not even a promise therein contained that it would ever be constructed there. Plaintiff's rights, if any, must therefore be contractual in character, and must depend upon such rights as she acquired as a member of the Sea Gate Association.

[2] Considering the character of such association, these rights were subject to reasonable regulation for the benefit of the other members thereof. We deem the regulation, adopted prior to plaintiff's purchase, and of which she had knowledge, to the effect that the capacity of its water and sewer system should not be further burdened by subjecting the same to the use of buildings erected for boarding houses, lodging houses, or inn or hotel purposes, a reasonable regulation.

[3] Therefore when plaintiff, in order to induce defendant to extend its water and sewer system over other lands belonging to it or under its control, so as to permit her to make connection with and use the same, falsely represented that the building which she was constructing was a private residence, she in effect said that it was not to be used for either of the prohibited purposes. In making such statement she was guilty of a false and fraudulent representation as to a material fact. By means of this, defendant was induced to agree to furnish facilities to her that it was not otherwise obliged to provide. When the falsity of these representations appeared, defendant was authorized to withdraw from its agreement and sever plaintiff's connection with the sewer and water pipes, which, induced by such false representations, it had caused to be laid.

The judgment should be reversed, both upon the facts and the law, and a new trial granted, costs to abide the final award of costs. .

WOODWARD and RICH, JJ., vote to affirm on the opinion of KELLY, J., at Special Term, which is as follows:

The plaintiff sues for an injunction restraining the defendant from disconnecting the water supply and sewer connections from her house at Sea Gate, on the west end of Coney Island. The plaintiff has a large house on her property, in which she lives with her family, and she keeps a boarding house on the premises. She has maintained a boarding house in Sea Gate for many years in other localities. Her present house was built in 1909. The water mains were connected with her house under a permit signed by the defendant's superintendent, for which the plaintiff paid $20. The sewer connection is with the general sewer outlet of the Sea Gate property, and runs through the center of the block in the rear of the plaintiff's property. It is said that it is on private property. This may be so; but it has been maintained and used by the property owners in Sea Gate generally for a long time, and I must assume that it is lawfully in place. The private property must be subject to some easement for its maintenance. At any rate, the defendant asserts control over it and the right to cut off plaintiff's connection with the sewer. The owners of the private property are not parties to this action, and I do not think there is any difficulty in settling the questions involved as to the sewer as between the plaintiff and defendant in this action.

The defendant admits its intention to cut off the plaintiff's water supply and sewer connection, and its reason for the very drastic measure proposed is that plaintiff carries on a boarding house on her property, which the defendant alleges to be contrary to certain rules and regulations which it has established. The property owners at Sea Gate founded the defendant association in 1899 for their mutual comfort and convenience and the care of the Sea Gate property. The land in question at the west end of Coney Island has been laid out and developed by the Norton Point Land Company incorporated in 1894. That company platted the property, and laid out, built, and maintained streets, including Beach Fiftieth street, on which plaintiff's premises are located, and offered lots for sale to the public by the familiar methods used by such land companies.

The maps filed by the Norton Point Land Company (Exhibit B) showed the streets. The advertisements, prospectus, and pamphlets issued to attract customers prior to the sale of the lots owned by plaintiff are in evidence. They contain statements such as the following:

Exhibit D: "The company has completed a system of macadamizing roads and sewer, water, and gas mains extended beneath."

Exhibit E: "The improvements that have been made upon the property by the Norton Point Land Company comprise some 25,000 feet of macadamized streets, curbs, sidewalks, water, gas, and an underground electric lighting service, together with a perfect system of sanitary sewerage, for which improvements there will be no assessments; Sea Gate being a fully finished property."

And later in the same exhibit: "Its broad streets and avenues are laid out according to the topographical outlines of the peninsula upon which it is situated. The sewerage system which has been introduced, together with the water and gas mains and the electric light service, have all been built in the most substantial manner under the supervision of the company at a cost of over $300,000, which is in itself a guarantee of its permanency."

Plaintiff's Exhibit H contains the following language: "Norton Point Land Company Price List May 1st, 1898. Sea Gate, Coney Island Point, New York. The company reserves the right to advance prices without notice. All sales made subject to the approval of the company. All improvements introduced, sewers, macadamized roads, water, gas, and electricity, with no assessments to purchasers."

By reason of these advertisements, people were attracted to the place, among others, James McAlley, who purchased from the Norton Point Land Company, on October 20, 1897, lots 19, 20, 21, in block 17, shown on the map. On June 3, 1901, the Norton Point Land Company conveyed to McAlley a second piece of land in the same block. These two conveyances cover the

premises now owned by plaintiff, who purchased from McAlley's executor on December 22, 1908. There is no question that the grantor company reserved to itself the fee of the land in the streets, and that in February, 1901, the Norton Point Company conveyed to the defendant association the fee of the land in the streets, as well as all rights which the company possessed in the improvements on or under the streets, water mains, sewers, etc., *"subject, however,* to any easement or right now existing with regard to the same, and to an easement or easements in favor of any and all of the lands still remaining the property of the party of the first part, and of the owners or occupants of any such land at any time, of the same character and extent as is appurtenant to like lands heretofore sold and conveyed by the party of the first part."

Of course, McAlley, who had already purchased, had acquired the right to use the streets and to avail himself of the manifold advantages advertised by the company as appurtenant to the lots sold to him, and herein the deed under which the defendant asserts its rights in the streets is specific notice that such easements existed and attached to the lots remaining unsold, among the latter, the lots purchased by McAlley in June, 1901.

The situation was the usual one in cases of land development. The original company laying out the property constituting streets, installing water, sewerage, and like conveniences to attract customers and enhance the value of its lots, but reserving the fee of the streets and the title to the improvements in the streets, having disposed of its lot holdings, could not reasonably be expected to continue the maintenance of these public improvements for the benefit of the lot owners, and therefore turned over to the property owners represented by the defendant all of this property for the general good.

But the defendant took no more than the Norton Point Company had to convey. McAlley clearly had the right to connect the property with the sewers and with the water mains as long as he violated no covenant contained in the conveyance to him. And when he sold the premises to the plaintiff in 1908, she became the owner of all the rights and easements appurtenant to the premises. She had the right to connect with the water main and the sewer. There was only one source of water supply and one sewer, and these were the improvements installed by the Norton Point Land Company. Certainly that company, and the defendant as its successor, could prescribe reasonable rules and regulations for the use of these facilities. The requirement that permits should be obtained from the defendant's superintendent and a charge paid was not unreasonable. Similar regulations exist with regard to sewer and water connections in all parts of the city.

But the defendant association could not refuse to issue the necessary permits because the property owner refused to restrict the use to which she was entitled to put her property. There is no condition, covenant, or agreement in her title prohibiting the use of the premises for a boarding house. The restrictions in plaintiff's chain of title are against tenement houses, and offensive, noxious, or dangerous trades or business. The very language of the covenant indicates that it was not intended to exclude trade or business as long as it was not offensive, noxious, or dangerous; but it was provided that no tenement house or store for the sale of merchandise should be erected before January 1, 1915, except on the written consent of the Norton Point Land Company. There was also an agreement that the building to be erected should cost at least $3,000, and should stand back 20 feet from the curb.

Search will be made in vain for any covenant that the premises are to be used for the purpose of private residence. Indeed, I find no covenant limiting the use to which the property may be put, except the familiar covenant against "offensive trades." Neither in the deeds nor in the advertisements or the prospectus is there a suggestion that the premises shall not be used for a boarding house.

And no objection was made to boarding houses by the Norton Point Land Company or by the defendant until January 8, 1909, when the board of directors of the Sea Gate Association passed a resolution directing the president to "send a letter to the members of the Sea Gate Association, and the property owners of Sea Gate, in a form to be approved by a committee consisting of the president, Mr. Rowe, and Mr. Davis, stating generally that it

is the purpose of the directors to refuse to consent to the building of houses at Sea Gate for boarding house purposes."

In pursuance of this resolution, the president of the defendant issued a notice to the property owners, dated February 1, 1909, in which he stated that "the board of directors of the Sea Gate Association, after much consideration, have reached the conclusion that the community as a whole, and its various conveniences, should not be further burdened by aggregations of residents in boarding houses, lodging houses, inns, and hotels, in addition to houses now being used for these purposes."

But the board of directors had no authority to impose restrictions on the plaintiff's real estate. As a basis for such radical action as cutting off water and sewer connections, it may well be urged that the language of the resolution of January 8, 1909, falls short, and is no authority whatever. A resolution that it is the purpose of the directors to refuse to consent to the building of houses for boarding house purposes is not even a resolution that the property shall not be used for boarding houses. There is no claim that the plaintiff ever assented to such a resolution. There is nothing in membership in the defendant association, to which as a property owner she appears to be entitled as a matter of right, which authorizes the board of directors to impose restrictions on the use of her real estate.

Covenants running with the land, restricting the use of property owned in fee simple, cannot be created by parol, nor can they be read into a title indirectly. It may be that the property owners at Sea Gate wish to restrict the property against boarding houses; but, if so, the proper method is to obtain the signatures of the owners of the real estate to an instrument so restricting the use of the property. Such a document, if filed, is notice to the world of the existence of such restrictions, and an intending purchaser will be warned, if the resolutions interfere with his plans; but the resolutions of the directors of a property owners' association, declaring their views or intentions, have no such effect. The fact is, as far as the record goes, that in the original development of the property it appears that there was no objection to boarding houses, the plaintiff and others were welcomed, but now, that the place has grown, new social ideas have developed, and the property owners desire to be more exclusive and select in their surroundings. All this may be natural and unobjectionable; but it affords no legal reason for imposing burdens on the plaintiff for the benefit of the community at large.

I conclude that she had a right to the water and sewer connections on complying with the reasonable regulations of the defendant as to permits and the like. The fact that the permit was obtained by deception and falsehood on the part of plaintiff's husband has this bearing on the case. If her right to the connections depended on his letter, she would have no standing in a court of equity; but, when she had the right to what was given to her, the fact that he was guilty of deceit should not weigh against her. The contention of the learned counsel for defendant that the boarding house violated the covenant against offensive trades is not well founded in my opinion. Nor is there any evidence that the water supply or sewers are unduly taxed by plaintiff's boarding house.

I do not see that it is necessary to prolong this opinion by citation of authority. There is no novel proposition of law involved in this decision. That the filing of the map showing streets laid out created an easement in favor of plaintiff, see Lord v. Atkins, 138 N. Y. 184, 191, 33 N. E. 1035; Reis v. City of New York, 188 N. Y. 58, 80 N. E. 573; Trustees v. Cowen, 4 Paige, 510, 27 Am. Dec. 80; Matter of the Mayor, 188 N. Y. 581, 80 N. E. 1109. That the absence of restrictive covenants in the deeds rendered the resolution of the board of directors ineffective, see Thousand Island Park Association v. Tucker, 173 N. Y. 203, 65 N. E. 975, 60 L. R. A. 786.

Plaintiff is entitled to judgment restraining the defendant from cutting off the water and sewer connections, with costs.